

**SIGNED this 18 day of March, 2011.**

```
                                    /s/ Marcia P. Parsons
                              _____
                                    Marcia Phillips Parsons
                              UNITED STATES BANKRUPTCY JUDGE
```
_____

**[This opinion is not intended for publication as the precedential effect is deemed limited.]**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re<br><br>   WILLIAM SCOTT ALLEN and<br>   SUE ANN ALLEN,<br><br>                     Debtors. | No. 09-53078<br>Chapter 7 |
| GEORGE TAYLOR and<br>MARY BETH TAYLOR,<br><br>   Plaintiffs,<br><br>vs.<br><br>WILLIAM SCOTT ALLEN,<br><br>   Defendant. | Adv. Pro. No. 10-5004 |

## M E M O R A N D U M

Appearances:

| | |
|---|---|
| Jeffery S. Greene, Esq.<br>Post Office Box 326<br>Newport, Tennessee 37821<br>*Attorney for George and Mary Beth Taylor* | L. Kirk Wyss, Esq.<br>Post Office Box 1778<br>Morristown, Tennessee 37816<br>*Attorney for William Scott Allen* |

**Marcia Phillips Parsons, United States Bankruptcy Judge**. In this adversary proceeding, the plaintiffs George and Mary Beth Taylor seek a judgment against the debtor William Scott Allen and a determination of nondischargeability under 11 U.S.C. § 523(a)(2)(A), arising out of his alleged fraud in the construction of their house. Trial in this action was held on January 20, 2011. As discussed below, the court concludes that the allegation of fraud is not supported. Accordingly, judgment will be entered in favor of the debtor and this action dismissed. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(I).

I.

On March 26, 2008, the debtor and plaintiffs entered into a construction contract wherein the debtor agreed to construct for $292,960 a house for the plaintiffs on real property owned by them in Newport, Tennessee. The house was to be constructed in accordance with plans drawn by Reggie Allen Designs[1] that were attached to the contract. The plaintiffs were retired high school science teachers living in Texas who planned to retire in Tennessee. The debtor had been recommended to them by their architect, and the plaintiffs had walked through a couple of houses previously built by the debtor.

Construction on the plaintiffs' house began on April 15, 2008. Pursuant to the contract, the debtor was to receive payment at various stages of construction: $58,592 upon the execution of the agreement; $58,592 at the start of rough framing; $58,592 at the start of drywall; $48,592 at the start of painting; $48,592 at the start of flooring; and the $20,000 balance upon the filing of a notice of completion. By August 22, 2008, the debtor had received $224,368 in scheduled draws, plus $24,413.67 for change orders requested by the plaintiffs, but the house was far from complete. At some point in September 2008 the debtor discussed with at least one of the plaintiffs that there were some outstanding bills and that more money would be needed to complete the house. As a result of this conversation, the plaintiffs directly paid three bills: $12,681.72 to G&H Builders for outstanding labor on September 22, 2008, and $5,000 the same date to Unlimited Climate Control for the balance

---

[1] The debtor and Reggie Allen are not related.

owed on the heating and air conditioning system; and $29,005.96 to Builders First Source for unpaid materials on September 24, 2008.

In late September the plaintiffs advised the debtor that they no longer wanted his services and that they would be hiring a new contractor. They asked him if there were any other outstanding bills and he indicated that there were none. Nonetheless, amounts were still owed at that time to Tidi Waste Systems for a leased dumpster and portable toilet and to A Thru Z Rentals for leased scaffolding. The plaintiffs paid a total of $1,0181.47 to these two creditors. The plaintiffs confirmed their termination of the debtor in a letter to him from their attorney dated October 13, 2008.

Once the plaintiffs hired a new contractor they learned of certain defects in the house that they had not discovered on their own. They eventually spent an additional $52,653.70 to correct these defects.

Over a year later, the debtor and his wife filed for bankruptcy relief under chapter 7 on November 11, 2009, with the plaintiffs commencing this action on February 10, 2010. In their complaint, the plaintiffs allege that the debtor breached the construction contract by failing to perform the work in a workmanlike manner and that he knowingly, with the intent to defraud, installed and concealed nonconforming and defective materials. The plaintiffs also allege that the debtor, with the intent to deceive, failed to use the draws for their intended purpose and, to the contrary, used the monies for personal gain. In their complaint, the plaintiffs seek judgment in the amount they paid the debtor ($248,781.67), plus attorney fees, consequential damages, and punitive damages, along with a determination of nondischargeability under 11 U.S.C. § 523(a)(2)(A).[2]

At trial, the plaintiffs made the additional allegation that the debtor failed to advise them that his contractor license had expired before he began construction.[3] They assert that this is a deceptive

---

[2] The complaint also raised § 523(a)(4) of the Bankruptcy Code as a basis for nondischargeability. However, this court, in an earlier order, granted the debtor's motion for summary judgment on this issue.

[3] Under Federal Rule of Civil Procedure 15(b)(2), applicable here through Federal Rule of Bankruptcy Procedure 7015, a party may move at any time to amend the pleadings to conform them
(continued...)

3

practice *per se* under Tennessee law, entitling them to recover any profit paid to the debtor and treble damages.[4] Counsel for the plaintiffs also advised the court at the commencement of the trial that the amount of judgment sought by the plaintiffs was $114,249.02. This amount represents the total sums that the plaintiffs had to pay to unpaid subcontractors and vendors ($47,769.13) plus the alleged profit retained by the debtor ($66,479.89). The profit figure was calculated by subtracting the total of invoices provided by the debtor ($182,301.80) from the total draws given to the debtor ($248,781.67).

The only witnesses at trial were the plaintiffs and the debtor.

II.

11 U.S.C. § 523(a)(2)(A) excepts from discharge debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). The Sixth Circuit has held that a creditor seeking to prove that a debt is nondischargeable under this provision must prove the following elements:

> (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the

---

[3](...continued)
to the evidence and to raise an unpleaded issue. When an issue not raised by the pleadings is tried by the parties' express or implied consent, it is to be treated in all respects as if raised in the pleadings. Although the plaintiffs did not move at trial to amend the pleadings to raise the unlicensed contractor argument, the debtor did not object to its consideration and defended against the claim. Accordingly, the court concludes that the debtor impliedly consented to trial of the issue. *See Smith v. EMC Corp.*, 393 F.3d 590, 596 (5th Cir. 2004) (citing *United States v. Shanbaum*, 10 F.3d 305, 312–13 (5th Cir. 1994)) (Factors to consider in determining if there has been implied consent to try the issue include "whether the parties recognized that the issue entered the case at trial, whether the evidence supporting the issue was introduced at trial without objection, and whether a finding of trial by consent would prejudice the opposing party.") .

[4]Tennessee law provides that a contractor who acts without a valid license can only recover "actual documented expenses that can be shown by clear and convincing proof." Tenn. Code Ann. § 62-6-103(b). Additionally, under the Tennessee Consumer Protection Act, if the use or employment of the unfair or deceptive act or practice was "willful or knowing," the court may award three times the actual damages sustained. Tenn. Code Ann. § 47-18-109(a)(3).

debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation, and (4) its reliance was the proximate cause of loss.

*Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 280–81 (6th Cir. 1998). Each element must be proven by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654 (1991). Further, exceptions to discharge are to be strictly construed against the creditor. *In re Rembert*, 141 F.3d at 281.

A fraudulent and material misrepresentation, for the purposes of the first *Rembert* factor, is a "substantial inaccurac[y] of the type which would generally affect a lender's or guarantor's decision." *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 761 (Bankr. E.D. Tenn. 2003) (quoting *Candland v. Ins. Co. of N. Am. (In re Candland)*, 90 F.3d 1466, 1470 (9th Cir. 1996)). This misrepresentation must be made with either knowledge of or reckless disregard for its falsity. *Old Republic Title Co. of Tennessee v. Looney (In re Looney)*, No. 309-0088A, 2010 WL 3199618, *3 (Bankr. M.D. Tenn. Aug. 6, 2010).

The second *Rembert* element, whether the debtor possessed an intent to defraud, is measured by a subjective standard. *In re Rembert*, 141 F.3d at 281 (citing *Field v. Mans*, 516 U.S. 59, 70–72, 116 S. Ct. 437 (1995)). "What courts need to do is determine whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent." *Id.* at 282 (quoting *Chase Manhattan Bank v. Murphy (In re Murphy)*, 190 B.R. 327, 334 (Bankr. N.D. Ill. 1995)).

Similarly, the third *Rembert* element is also in part subjective, requiring a showing by the creditor that he actually relied and, objectively, that his reliance was justifiable. *In re Copeland*, 291 B.R. at 767. "Under this standard, a creditor will be found to have justifiably relied on a representation even though he might have ascertained the falsity of the representations had he made an investigation." *Id.* (quoting *Comm. Bank & Trust Co. v. McCoy (In re McCoy)*, 269 B.R. 193, 198 (Bankr. W.D. Tenn. 2001)).

Lastly, the creditor's reliance on the debtor's misrepresentations must have been a proximate cause of the loss sustained by the creditor. *Id.* In other words, there must be a direct link between the alleged fraud and the creation of the debt in order to satisfy the fourth *Rembert* requirement. *Id.*

5

III.

In the present case, the plaintiffs contend that the debtor made three material misrepresentations that warrant a finding of nondischargeability. First, they state that he held himself out as a general contractor even though he was no longer licensed. Second, they assert that the debtor falsely represented that vendors and subcontractors had been paid in order to receive new draws. Third, they allege that the debtor knowingly installed and concealed defective materials and shoddy construction. In addition to these three specific alleged misrepresentations, the plaintiffs contend that all of the facts in this case, considered together, demonstrate that the debtor intended to defraud and deceive them. Each of these allegations will be addressed in turn.

A. Contractor's License

With respect to the licensed contractor issue, the evidence was undisputed that the debtor was a licensed contractor for a number of years and that his license was still in effect at the time he entered into the construction contract with the plaintiffs on March 26, 2008. However, his license expired on March 30, 2008, and thus the debtor was not licensed at the time he actually commenced construction on the plaintiffs' house the next month. The plaintiffs testified that they did not learn of the expiration until June 2008 when he informed them of the fact. The debtor denied any attempt to deceive arising from the expiration, noting that his license had expired before and that renewal was just a matter of paying a penalty[5] and completing the paperwork which he had a year to do.[6] He also testified, though, that at some point during the construction he decided that he would get out of the contracting business and that the plaintiffs' house would be his last construction project. As such, the debtor never renewed his contractor license.

---

[5] The Tennessee Board for Licensing Contractors has the authority to set fees for license applications and post-expiration renewals. Tenn. Code Ann. § 62-6-111(a)(1)(A). Currently, that renewal fee is $200, but it is increased by 10% for every month that the contractor delays applying for renewal. Tenn. Code Ann. § 62-6-116(f).

[6] Tennessee law provides that contractors may apply to renew their licenses up to one year after their license has expired. Tenn. Code Ann. § 62-6-116(g). This is not a true grace period, however, because the contractor is no longer legally licensed.

Under Tennessee state law, acting as a general contractor without a valid license is "construed to constitute an unfair or deceptive act or practice affecting the conduct of trade or commerce under the Tennessee Consumer Protection Act of 1977." Tenn. Code Ann. § 62-6-136(b). The plaintiffs argue that because the debtor's unlicensed activity as a contractor constitutes a deceptive act under state law, it is also a *per se* fraudulent misrepresentation under the Bankruptcy Code.

The plaintiffs' argument is not supported by case law. Section 523(a)(2) "requires a showing of actual or positive fraud, not merely fraud implied by law." *In re Rembert*, 141 F.3d at 281 (quoting *Anastas v. Am. Savings Bank (In re Anastas)*, 94 F. 3d 1280, 1286 (9th Cir. 1996)). "Actual fraud is the type involving moral turpitude, or intentional wrong, and thus there can be no mere imputation of bad faith." *In re Anastas*, 94 F.3d at 1286 (quoting *Public Fin. Corp. of Redlands v. Taylor (In re Taylor)*, 514 F.2d 1370, 1373 (9th Cir. 1975)); *see also Mack v. Dixie-Shamrock Oil & Gas, Inc. (In re Dixie-Shamrock Oil & Gas, Inc.)*, 53 B.R. 262, 266 (Bankr. M.D. Tenn. 1985). In contrast, deceptive acts under the Tennessee Consumer Protection Act are not necessarily knowing or intentional; negligent misrepresentations also qualify. *Fayne v. Vincent*, 301 S.W.3d 162, 177 (Tenn. 2009). For this reason, courts have concluded that unfair or deceptive acts under state law do not automatically constitute fraud under the Bankruptcy Code. *See Tomlin v. Crownover (In re Crownover)*, 417 B.R. 45 (Bankr. E.D. Tenn. 2009) (state court judgment that debtor-contractor engaged in deceptive act under Tennessee Consumer Protection Act does not establish two of the four elements of § 523(a)(2)); *Sack v. Friedlander (In re Friedlander)*, 170 B.R. 472 (Bankr. D. Mass. 1994) (state court judgment for violation of Massachusetts Consumer Protection Act did not establish by collateral estoppel a finding of nondischargeability under § 523(a)(2) which requires proof of actual fraud); *Morgan v. Kanak (In re Kanak)*, 85 B.R. 483, 487 (Bankr. N.D. Ill. 1988) (fraud under § 523(a)(2)(A) is more stringent than Illinois Consumer Fraud and Deceptive Business Practices Act because former mirrors requirements for proof of common law fraud while latter renders even innocent misrepresentations actionable and imposes liability without proof of invidious intent); *Schneiderman v. Fumiko (In re Taketa)*, No. 09-00024, 2009 WL 5386127 (Bankr. D. Hawaii, Nov. 23, 2009) (acting without a contractor's license which constituted an unfair and deceptive trade practice under Hawaii law did not equate to fraud under § 523(a)(2)(A)). *Cf. Heinold*

*Commodities & Sec., Inc. v. Hunt (In re Hunt)*, 30 B.R. 425, 441 (M.D. Tenn. 1983) (state statutes that presume or imply fraud in the presentation of an insufficient funds check cannot be employed to establish fraudulent intent under § 523(a)(2)). Therefore, the court must still ascertain whether the plaintiffs have established the requirements of § 523(a)(2)(A) with respect to the debtor's lapsed contractor license.

Turning to the first requirement under *Rembert*, that the debtor obtained money through a material misrepresentation that, at the time, he knew was false or made with gross recklessness as to its truth, there was no evidence that the debtor overtly represented after he began construction that his license was still in effect. To the contrary, the plaintiffs' fraud contention in this regard appears to be based on the debtor's failure to disclose for a period of time that his license had expired and his operating as a general contractor without a license. Undeniably, a debtor's silence and intentional non-disclosure of a material fact may constitute a misrepresentation actionable under § 523(a)(2)(A). *In re Copeland*, 291 B.R. at 760. However, there is no evidence in the present case that suggests that the debtor concealed the fact that his licensed had expired with the subjective intent to deceive the plaintiffs, the second *Rembert* element. From the debtor's viewpoint, the renewal of his license was simply a formality that he had a year to take care of and one that did not impact his work with the plaintiffs in any practical way. Presumably, the debtor could have paid the required fees necessary to renew his license if it had been an issue. And, while no testimony was given regarding how the debtor happened to disclose the expiration of his license, the fact remains that he did disclose it to the plaintiffs, albeit after construction had already begun. Lastly, there was no indication that the debtor's failure to renew his license as a general contractor was the proximate cause of the loss sustained by the plaintiffs, the fourth *Rembert* requirement. This situation is distinct from that in which a contractor lies about his qualifications in order to induce the owner to enter into a contract with him. *Cf. Green v. Carle (In re Carle)*, No. 09-5055, 2010 WL 5394793 (Bankr. W.D. Tex. Dec. 28, 2010) (finding that statements made by an inexperienced contractor who lied about his qualifications were material misrepresentations that justified excepting the debt from discharge).[7]

---

[7] The court is not suggesting that this is a good business practice, since it is clearly contrary to state law. It is, however, not necessarily fraudulent under bankruptcy law.

8

The debtor had been a licensed contractor for a number of years and according to his estimation had built 40 to 50 houses. Accordingly, based on the foregoing, the court concludes that the *Rembert* elements for fraud have not been established with respect to the fact that the debtor continued to operate as a general contractor after his license had expired and initially failed to disclose this fact to the plaintiffs.

    B. Payment to Vendors and Subcontractors

The next alleged misrepresentation is that the debtor falsely represented that vendors and subcontractors had been paid in order to receive new draws. According to the plaintiffs, this misrepresentation occurred in two different ways. First, they refer to the conversation that they had when they fired him in late September 2008 when he stated that there were no other bills outstanding, even though sums remained owing for the leased dumpster, portable toilet, and scaffolding, around $1,000 in total. Second, the plaintiffs assert that during the construction process the debtor submitted to them copies of various invoices and falsely represented that they had been paid in order to obtain additional draws. A list of all of the invoices that the debtor presented to the plaintiffs, with the exception of the invoice from Unlimited Climate Control for the heating and air conditioning system, was introduced into evidence as Exhibit 9.

Turning first to the conversation when the debtor was fired, the debtor did not deny having represented to the plaintiffs that he believed that all bills had been paid. He stated, however, that these bills were an oversight and that there was no intention to deceive the plaintiffs. He also testified that Carson Graves with G&H Builders had told him that he might still need the scaffolding and that he would return it when he was finished with it.

The court found the debtor to be credible on this point. He had previously disclosed to the plaintiffs the fact that sums were still owing to the G&H Builders, Unlimited Climate Control, and Builders First Source, debts totaling $46,687.68. The court can conceive of no logical reason that the debtor would willingly disclose these large debts but intentionally hide the existence of the two smaller debts. Critically, the debtor had nothing to gain by the alleged lie. He had just been fired and would not be receiving any further draws. Thus, the court is not persuaded that the debtor

knowingly misrepresented the existence of these obligations or that the statement was made with the intent to deceive the plaintiffs. Further, there is no evidence that the plaintiffs relied in any respect on the debtor's misrepresentation. They made no further advances of money to him, nor acted in a manner that they would not have otherwise acted but for the misrepresentation. In fact, Mr. Taylor testified that he knew the debtor's statement was false at the time it was made because someone had come by earlier that day and recovered the leased portable toilet because of non-payment. Accordingly, because the required elements of *Rembert* are not present, the debtor's misstatement about outstanding debts was not fraudulent.

The court turns next to the alleged misrepresentations about the invoices that the debtor submitted to the plaintiffs. According to the plaintiffs, the debtor falsely represented that the invoices had been paid in order to receive additional draws. Notwithstanding this allegation, the evidence was unclear as to what statements, if any, the debtor actually made at the time he tendered the invoices. Neither of the plaintiffs testified that the debtor expressly stated that the invoices listed in Exhibit 9 had been paid by him. Rather, Mrs. Taylor testified that it was her "understanding" that the submitted invoices represented expenses that the debtor had paid and was required by the contract to present before he could receive the next draw.

The debtor, on the other hand, denied ever representing to the plaintiffs that the invoices he submitted to them represented paid receipts. The debtor also testified that he was unaware that this was the plaintiffs' understanding, noting that draws under the contract were based on construction progress rather than payment to vendors. He stated that the invoices he submitted to the plaintiffs represented expenses incurred on the project, but not necessarily paid expenses. He noted that he had initially provided them only to FSG Bank, the bank making the construction loan, but subsequently began giving them also to the plaintiffs. The debtor testified that when he gave the invoices to the plaintiffs he did not indicate whether they had been paid in full or in part or not at all.

The debtor is correct that draws under the parties' contract were not dependent on providing proof of payment of invoices incurred before the previous draw. To the contrary, the contract expressly provides that specific draw amounts will be paid at various stages of construction; no provision states as a condition precedent to a draw that an expense incurred prior to that time must

have been paid in full.  Further, Mrs. Taylor testified that at the time of each draw request a representative from the bank would come out to the construction site and determine that the debtor had completed the requisite level of construction before releasing the next draw.

Regardless of what the submitted invoices signified, the critical defect in the plaintiffs' argument is that there was no evidence that the invoices listed in Exhibit 9 had not been paid by the debtor and that, therefore, any alleged representation to that effect was false.  Granted, the plaintiffs had to pay certain creditors, the three that the debtor told them about in September 2008 and the two that the plaintiffs later discovered on their own.  However, there was no evidence that the invoices paid by the plaintiffs had been presently submitted to them by the debtors.  Exhibit 9, the list of invoices submitted to the plaintiffs by the debtor, does reference invoices for G&H Builders, Builders First Source, and A Thru Z Rental Company.  But Mrs. Taylor testified that she did not know if these particular invoices included amounts that she and her husband had to pay to these creditors or if the amounts they paid represented work after the debtor's last draw and for which he had not submitted an invoice.

The only exception to this testimony was the undated invoice of Unlimited Climate Control in the amount of $18,200, marked as Exhibit 8.  Mrs. Taylor testified that she left this invoice off the Exhibit 9 list that she had prepared because she knew that it had not been paid in full, as they had to pay a $5,000 balance.  Further, both Mr. And Mrs. Taylor were asked by their attorney in response to leading questions if the debtor had presented this invoice to them as a paid receipt, and they both answered in the affirmative.  Mrs. Taylor was also asked a follow-up question by her attorney, whether the debtor then got another draw, and she also testified in the affirmative.

However, it was not clear from their testimony whether this invoice was treated differently by the debtor, such that he made an explicit statement that this particular invoice had been paid, or whether he simply submitted it to them in the same fashion as he had the others, with the plaintiffs simply relying on their own subjective understanding of the significance of the submission. Just as critically, there was no testimony as to when the debtor presented the invoice to the plaintiffs - the invoice is undated - and the amount of the draw that the debtor subsequently received, as only that amount would have been fraudulently "obtained" by the representation.  Because of the vagueness

11

of the evidence on these crucial points, the court is unable to reach the conclusion that the plaintiffs carried their burden of proof of establishing the first element of *Rember*t, that the debtor obtained money through a misrepresentation.

    C. <u>Defective Materials and Shoddy Construction</u>.

The third alleged misrepresentation is that the debtor knowingly installed defective materials and concealed shoddy construction with the intent to defraud the plaintiffs. Contrary to this assertion, there was no evidence in this case that the debtor installed defective materials. However, there was substantial testimony as to poor construction. Specifically, the plaintiffs testified that there was no cross-bracing in the basement walls; no headers over any basement windows; the exterior western walls of the house and basement did not meet but were separated by a one-foot gap; the basement floor was not level, so cabinets had to be shimmed up several inches; the lights in the stairwell leading to the basement were not properly aligned; the kitchen walls leaned, creating a two-inch gap between the countertops and the walls; the floor in a first-floor room sloped, so that one side of the room was three inches lower than the other and windows on adjoining walls were misaligned; the electrical wiring was a different gauge than what was specified in the design plans; and on the second floor, a post in a deck railing was built directly in front of a bedroom window, thereby obstructing the intended view.

Additionally, the plaintiffs had two complaints about the debtor's conduct regarding the roof. First, they testified that he purchased the wrong color of roofing materials and that when they pointed out the error, the debtor said that he would order the right color, but instead painted the materials. Although the debtor later purchased and installed roofing materials with the right color, they note that he never repaid them for the necessity of having purchased the materials twice. Second, the plaintiffs testified that the debtor installed drywall before enclosing the roof in order to receive the drywall draw under the contract and because it was several weeks before the roof was installed,[8] inclement weather destroyed a great deal of the drywall and subflooring. The plaintiffs argued that

---

[8] The parties disagreed as to the length of time the drywall was exposed before a permanent roof was constructed. The plaintiffs alleged that it was over seven weeks, while the debtor asserted that it was six weeks.

the debtor wanted the draw in order to finance family vacations to Brazil and Disney World, both of which he took during the construction of their house.

In response to the plaintiffs' testimony about the shoddy construction, the debtor appeared to be somewhat surprised at the plaintiffs' litany of the numerous defects. He did not respond directly to specific complaints, other than to state that he did not recall putting up any railing. The debtor did readily admit to mismanagement of the project, saying that he did not do the best job that he could have done. He expressed regret for his performance and the additional costs incurred by the plaintiffs but disputed the suggestion that he intended to harm or deceive the plaintiffs. When asked to explain what went wrong, the debtor testified that costs were much higher than he had anticipated. He noted, for example, that he had to use more expensive materials than he had planned for the beam in the great room, increasing the cost by several thousand dollars. The debtor also testified that labor costs through the use of G&H Builders were three times higher than estimated and that he had expected to do a lot of the work himself. The debtor opined that he should have been firmer in payment negotiations with the subcontractor so as to keep these costs low but kept using the subcontractor because the plaintiffs liked him.

As to the roof, the debtor testified that he installed the drywall after placing the order for the roofing materials, noting that at the time he began installation, the roof was already framed, sheeted, and had felt over the top. He stated that in previous projects he had installed drywall before constructing a permanent roof and the felt roof had protected the drywall. In this instance, however, when he went back to pick up the roofing materials, he discovered that the salesman he was dealing with had never placed the order. The debtor stated that he then placed a new order with a different manufacturer, but the materials delivered were the wrong color. In order to save time, he decided to paint the roofing materials when the manufacturer told him that they could be painted with a particular type of paint. After painting, however, he decided not to use the painted materials because he felt uncomfortable with the decision and again ordered new roofing materials. The debtor expressed regret for the delays in roofing the house and the resulting damage, but stated that it was unforeseeable that this series of mishaps would occur. The debtor testified that he had installed the drywall when he did in order to move the construction along and to prevent further delays; he denied

13

that his financial gain was a factor. The debtor explained that the trip to Brazil was a mission trip that he took with his church, rather than a family vacation, and that the family trip to Disney World had been long planned.

While the number of construction defects in the plaintiffs' house was very disturbing such that it was clear that the debtor's performance as a builder was substandard, there is no evidence that the debtor concealed any of the defects or made any misrepresentations in this regard. Granted, the debtor would appear to have breached his contract with them by failing to perform his work in a workmanlike manner. However, breach of contract does not constitute fraud or provide a basis for excepting a debt from discharge. *See Lobdell v. Rodruck (In re Rodruck)*, No. 07-30134, 2010 WL 1740792, *2 (Bankr. N.D. Iowa Aug. 28, 2010). Although the shoddy work in this case arguably suggests gross negligence, the court is not convinced that the debtor acted with the intent to deceive or to harm the plaintiffs. Likewise, there is insufficient evidence that the debtor intended to defraud the plaintiffs by painting the roofing materials. While the plaintiffs were justifiably upset regarding the fact that the roofing materials were painted rather than returned, the fact remains that the debtor did not install the painted roof.

Lastly in this case, the plaintiffs argue that all of the debtor's conduct regarding their home, taken as a whole, establish a scheme by him to deceive and defraud them. They allege in this regard that the debtor improperly used the draws that they gave him for personal gain. The plaintiffs note that at one point during the construction the debtor's bank account was garnished by an attaching creditor. Additionally, they also testified that they had difficulty reaching the debtor by phone and that he was rarely on the construction site.

In response, the debtor denied using the monies from the debtor, other than his profit, for anything other than the construction of their home. He admitted that an attaching creditor had taken money from his bank account but stated that he had replaced this money. He disputed the plaintiffs' claim that he was never around, stating that he was onsite 50% to 60% of the time. Regarding his profit, the debtor observed that the parties' contract did not specify how much of the contract price was for direct construction costs and how much represented profit. He testified, however, that in bidding his projects generally two-thirds of the price are for costs and one-third profit and overheard.

With regard to the plaintiff's construction, the debtor stated that he expected to make about $70,000 in profit.

Addressing first the issue of the draws given the debtor, the plaintiffs note that they gave the debtor $248,781.67 but he only had invoices for $182,301.80. Additionally, they contend that the invoice amount should be reduced by the $47,769.15 they had to pay to subcontractors and vendors, such that the debtor only used $134,532.65 ($182,301.80-$47,769.15) for their construction. Thus, they maintain that the debtor has failed to account for $114,249.02 ($248,781.67- $134,532.65). However, the mere fact that the plaintiffs had to pay $47,769.15 does not establish that this much of the $182,301.80 in invoices were not paid. As previously discussed, there was no evidence that the sums that the plaintiffs had to pay were included in the list of invoices that total $182,301.80. Moreover, the $182,301.80 total does not include the $18,200 invoice from Unlimited Climate Control, which had been paid by the debtor with the exception of $5,000. Thus, it is just as likely that the debtor spent a total of $195,501.80 ($182,301.80 + ($18,200-$5,000)) on the plaintiffs' construction and retained the balance of the $248,781.67 or $53,279.87 as a profit. While the plaintiffs may understandably argue that the debtor should not be able to retain any profit because of his poor management, the only pertinent question for purposes of this action is whether the debtor's retention of the monies was fraudulent. On this issue, there is no indication that the debtor made any misrepresentations regarding the monies kept by him or that he acted deceptively regarding these funds.[9]

As to the remaining allegations by the plaintiffs, it is clear that the debtor did not

---

[9]From statements of counsel at the hearing, the plaintiffs' primary argument regarding the profits retained by the debtor was that he should not be allowed to retain any profit because of his unlicensed status. This argument is based on Tenn. Code Ann. § 62-6-103(b), which provides that a contractor who acts without a valid license is not entitled to a profit and can only recover "actual documented expenses that can be shown by clear and convincing proof." Notwithstanding the validity of this argument under state law, the plaintiffs' claim against the debtor is excepted from discharge in this action only if it meets the requirements of fraud under 11 U.S.C. § 523(a)(2)(A). Because this court has concluded that there was no fraud arising from the debtor's failure to renew his license or from his retention of any sums as profit, any claim against the debtor based on Tenn. Code Ann. § 62-6-103(b) is not excepted from discharge.

15

communicate with the plaintiffs as often as he should have. Further, it is evident from the problems encountered that the debtor should have been personally on site more often, and probably should not have been out of town on the two trips that he made during the construction of the plaintiffs' home. However, neither of these facts, alone or in combination with the other evidence in this case, establish that the debtor intended to defraud or deceive the plaintiffs.

As a final comment, the court does not wish to minimize the problems that occurred in this construction project or the loss sustained by the plaintiffs. The court found the plaintiffs to be credible and can sympathize with what they have experienced. Their dream retirement home, which they had spent years planning, had become a money pit, with costs far exceeding what they had initially been told. Their reputable and experienced contractor did not perform as expected, and they had to pay dearly to correct mistakes that he should have caught if he had been more attentive. On the other hand, the court similarly found the debtor to be credible and honest. The court is firmly convinced that the debtor acted in good faith when he entered into the contract with the plaintiffs and that he had no intent to deceive or defraud them. Undeniably, he miscalculated the ultimate cost of the house and did a poor job of managing the construction. While his mistakes were regrettable - and should not have occurred - the court is firmly convinced that there was no fraud involved. Accordingly, any obligation that the debtor owes the plaintiffs arising out of his alleged breach of his construction contract is not excepted from discharge under 11 U.S.C. § 523(a)(2)(A).

IV.

An order dismissing this action in its entirety will be entered in accordance with this opinion.

# # #